IMOGENE FAGALA, Appellant, v. RAYMOND SANDERS *et al.*, Appellees.

Fifth District   No. 5—85—0048

Opinion filed January 29, 1986.

Michael A. Lawder, of Richard G. Reed, P.C., of Belleville, for appellant.

Maurice E. Gosnell, of Gosnell, Benecki, Borden & Enloe, Ltd., of Lawrenceville, and John Maxwell, of Houston, Texas, for appellee Amoco Production Company.

Ivan A. Elliott, Jr., of Conger & Elliott, P.C., of Carmi, for appellees The Beeson Group.

Ray Fehrenbacher, of Fehrenbacher Law Offices, of Olney, for appellee Marvin Craddock.

Mark Tungate, of Bowen, Miller & Tungate, of Flora, for appellee Raymond Sanders.

James B. Wham, of Wham & Wham, and George C. Lackey, of Lackey, Warner & Sauer, both of Centralia, for appellees William S. Sanders, Jr., Olive Jean Sanders, Rose Mary Charvat, Maggie Kay Carpenter, Betty Jo Nickels, Belva Geraldine Sanders and Olive Johnson.

J. Cody Fankboner, for appellee, *pro se.*

JUSTICE WELCH delivered the opinion of the court:

Imogene Fagala filed her motion in the circuit court of Marion County to set aside a settlement agreement between Mrs. Fagala and several other parties to the underlying action. The circuit court denied Mrs. Fagala's motion. She appeals. We affirm.

Mrs. Fagala's mother, Rosa Sanders, had five children. The other four were William S. Sanders, Jr., Olive Johnson, Raymond Sanders, and Clyde Sanders. Clyde Sanders predeceased Rosa Sanders and was survived by his five children, the plaintiffs herein. Rosa Sanders died intestate in 1972. After Rosa Sanders' death, at Raymond Sanders' request, Mrs. Fagala filled out and signed Rosa Sanders' name to a quitclaim deed conveying 80 acres of land from Rosa Sanders to Raymond Sanders. J. Cody Fankboner notarized the deed. Raymond Sanders entered into an oil and gas lease with Marvin Craddock. When this action was commenced the lease was owned by Amoco Production Company and a group of investors known collectively as the Beeson Group. When the lease became profitable, the facts surrounding the title of Raymond Sanders came to light and the children of Clyde Sanders commenced this action against the surviving children of Rosa Sanders and Amoco and the Beeson Group, seeking their

share of the profits. Apparently, when Mrs. Fagala's role in the creation of the deed became known, Amoco and the Beeson Group filed claims against her for sums exceeding two million dollars. We say "apparently" because none of the pleadings other than the complaint is in the record on appeal. Fankboner was also made a party to the action.

The case was set for jury trial beginning Monday, June 11, 1984. On that date the parties renewed efforts to settle the various claims and counterclaims. Negotiations continued until late on June 13. Mrs. Fagala was represented by attorney Roger Vetter. On June 13, with each of the individual parties in open court, the several attorneys announced that a complete settlement had been reached.

The ultimate agreement consisted of several written agreements, only one of which pertains to Mrs. Fagala. In that agreement, Mrs. Fagala released all claims against Raymond Sanders, Amoco, Craddock, Fankboner and the Beeson Group, arising out of the title and use of the 80 acres and the oil and gas production therefrom, and those parties released their claims against Mrs. Fagala. Mrs. Fagala agreed to quitclaim her interest in the 80 acres to Raymond Sanders, reserving a one-fifth interest in the minerals, and to ratify the oil and gas lease. Amoco and the Beeson Group agreed to pay Mrs. Fagala a total royalty of one-fifth of one-eighth of the oil and gas produced after June 1, 1984. Fankboner agreed to pay Mrs. Fagala $500.

The agreements between Amoco and the Beeson Group and the other successors of Rosa Sanders differed considerably from that agreed to by Mrs. Fagala: Each of the children (or their successors) received $300,000 and a share of real property owned by Fankboner, except for Raymond Sanders, who kept the 80 acres subject to mineral rights. Prior to accepting the settlement, the trial court questioned each of the individual parties in open court. Mrs. Fagala stated that she signed the agreement, discussed it with her attorney, understood it, had no questions, and requested the court's approval.

Approximately five weeks later Mrs. Fagala, represented by her new counsel, filed her written motion to set aside the settlement agreement. At the subsequent hearing, Mrs. Fagala testified she felt her settlement was unconscionable because the other successors to Rosa Sanders got so much more, even though her position was "the same as theirs." According to Mrs. Fagala, her attorney Mr. Vetter was optimistic about her chances for a profitable settlement during the first two days of settlement negotiations, though her position was not the subject of negotiations during those two days. On the third day, Vetter told her that he now believed she had only a 10% to 20%

chance of winning at trial, that the judge said she was in a risky position, and that the other attorneys said they might be able to take all she had except her social security checks; attorney Maxwell had said it would only take a short rope for Mrs. Fagala; attorney Lackey said if she did not settle only six jurors were needed for the firing squad. Mr. Vetter told her she had no chance and the other parties could take everything she had. Mrs. Fagala admitted she knew what the other children of Rosa Sanders were getting when she agreed to the settlement. According to Mrs. Fagala, she was first offered much less of a royalty interest, but refused Amoco's and the Beeson Group's initial offer. Mrs. Fagala admitted signing her mother's name to the deed, but stated "had it gone to trial to bring out all aspects of this case that you would find that I am not guilty of doing the things that they said I was guilty of doing and that one signing of that one paper did not make it a legal document."

Mrs. Fagala argues that the trial court should have set aside the agreement as unconscionable and as the product of duress. We disagree.

The record does not support the view that the agreement was manifestly unfair or unconscionable. (*Kalman v. Bertacchi* (1978), 57 Ill. App. 3d 542, 548, 373 N.E.2d 550, 555.) The disparity between the settlements to the successors of Rosa Sanders may well have been warranted by the difference in the claims against those parties. While the record does not include all of the pleadings, we do know that Mrs. Fagala is the person who filled out and signed her mother's name to the deed which caused this litigation, and that the other parties asserted claims against her exceeding $2 million. The record reveals no such claims against the other successors of Rosa Sanders. On this record, the other successors of Rosa Sanders may have been innocent parties with respect to the creation of that deed. We cannot conclude that the record shows Mrs. Fagala's settlement to be unfair in view of the apparent disparity in the compromised claims.

Nor can we view that agreement as the product of duress. Mrs. Fagala relies heavily on the statements of other counsel regarding the merits of her case as communicated to her by Mr. Vetter. However, it was usual and proper for counsel to discuss the merits of the case and relative prospects for recovery in arriving at a settlement agreement. A lawful demand or threatening to enforce one's right does not constitute duress in a legal sense. (*Alexander v. Standard Oil Co.* (1981), 97 Ill. App. 3d 809, 815, 423 N.E.2d 578, 582.) On this record, we cannot conclude that the comments of counsel as related to Mrs. Fagala were unduly pessimistic. Further, Mrs. Fagala's contention that

her will was overborn is refused by her admission that she refused at least one settlement offer prior to the one she accepted.

Mrs. Fagala also suggests that the trial judge's comment (relayed by attorney Vetter) that she was in a risky position led her to believe that the court was prejudiced against her. We are not advised as to the context in which this statement was made. However, assuming the statement was made, on this record it was not untrue on the eve of a jury trial involving over $2 million in claims against Mrs. Fagala. We do not regard that statement, if made, as indicating any prejudice against Mrs. Fagala, nor do we believe that any reasonable person would so view it.

We find no mistake of fact or law or understanding here which would justify upsetting the agreement in question. To hold otherwise on this record and Mrs. Fagala's assertion that she had discussed it with her attorney and understood what she was agreeing to would permit parties to negate a settlement simply because they later changed their minds as to the wisdom of their compromise. See *Kalman v. Bertacchi* (1978), 57 Ill. App. 3d 542, 373 N.E.2d 550.

For the foregoing reasons, the order of the circuit court of Marion County denying the motion to set aside the settlement agreement is affirmed.

Affirmed.

KARNS and HARRISON, JJ., concur.